## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EXPERIOR GLOBAL WAREHOUSING, LLC and LYNX HOLDINGS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BTC III HAMILTON DC LLC and ARES MANAGEMENT, LLC,<br><br>Defendants. | Civil Action No. 23-8472 (RK) (JBD)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the October 11, 2023 Motion for Preliminary Injunction (the "Motion") filed by Experior Global Warehousing, LLC ("Experior") and Lynx Holdings, LLC ("Lynx") (collectively, "Plaintiffs") against BTC III Hamilton DC LLC ("BTC"), Ares Management, LLC ("Ares"), and Blackcreek Group, LLC (collectively, "Defendants"). (ECF No. 13.)[1] Experior was a commercial tenant of BTC's warehouse space (the "Premises") pursuant to a multi-year lease dated January 24, 2023 (the "Lease Agreement"). This lawsuit and the pending Motion stem from Plaintiffs' allegations that water has seeped through the floor of the Premises and rendered it unusable for Plaintiffs' commercial purposes.

The Court previously granted Plaintiffs' application for a temporary restraining order ("TRO"). (ECF No. 16.) Defendants were enjoined from obtaining the proceeds of the Letter of Credit, issued by the Huntington National Bank, that Experior provided BTC pursuant to the Lease Agreement (the "Letter of Credit"). (*Id.*) While that TRO has been in effect, the parties attempted

---

[1] Blackcreek Group, LLC was subsequently dismissed from the lawsuit by consent. (ECF No. 56.)

to negotiate a settlement, (ECF Nos. 26, 29); the Court held an evidentiary hearing on the Motion when settlement talks failed, (ECF Nos. 36, 48, 50); and the parties attempted to mediate the matter before the Honorable Douglas E. Arpert, U.S.M.J. (ret.), (ECF No. 52). On June 5, 2024, the parties submitted a joint letter indicating that mediation had failed and requesting a decision on the Motion for Preliminary Injunction. (ECF No. 65.)

The Court has carefully considered the parties' arguments and evidence from their written submissions and the testimony heard at the March 18, 2024 hearing on the Motion. For the reasons set forth below, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction and **VACATES** the TRO currently in effect.

## I.  BACKGROUND [2]

### A.  LEASE AGREEMENT BETWEEN EXPERIOR AND BTC

The parties' relationship is governed by the Lease Agreement between Experior (the tenant) and BTC (the landlord) entered into on January 24, 2023 for the Premises at 2000 Marketplace Blvd. in Hamilton, New Jersey. ("Lease Agreement", Ex. A to Compl., ECF No. 1-2.)[3] The Premises consists of an approximately 266,000-square foot warehouse that includes 40

---

[2] In support of their Motion, Plaintiffs submitted: four submissions with attachments from Experior's President Michael Scialabba ("Scialabba"), (Aug. 22, 2023 Scialabba Aff., ECF No. 37-1 at *2–7; Oct. 11, 2023 Scialabba Aff., *id.* at *9–27; Nov. 6, 2023 Scialabba Decl., *id.* at *29–88; Jan. 26, 2024 Scialabba Aff., ECF No. 34-1); and three submissions from Peter Craig ("Craig"), Plaintiffs' "concrete floor and moisture consultant," (Aug. 21, 2023 Craig Aff., ECF No. 37-2 at *2–4; Oct. 24, 2023 Craig Decl., *id.* at *6–21; Nov. 3, 2023 Craig Decl., *id.* at *23–41).

In opposition to the Motion, Defendants submitted: two declarations from Lauren Huber ("Huber"), an employee "responsible for the asset management" of the Premises, (Oct. 30, 2023 Huber Decl., ECF No. 20-2; Feb. 1, 2024 Huber Decl., ECF No. 35 at *5–27); and three reports from a consulting structural engineer John N. Harrison ("Harrison"), (Aug. 14, 2023 Harrison Memo., ECF No. 20-2 at *22–26; Sept. 11, 2023 Harrison Memo., *id.* at *36–42; Oct. 24, 2023 Harrison Memo., *id.* at 54–55).

At the March 18, 2024 hearing, the parties presented testimony from Scialabba, Craig, Harrison, and James Murray, a real estate developer employed by Ares. (Mar. 18, 2024 Hr'g Tr. ("Hr'g Tr."), ECF No. 50.) Citations to the hearing will include the last name of the testifying witness.

[3] Lynx is a guarantor for Experior under the Lease. (Lease Agreement § 1.1(e).) Ares managed the property for BTC. (Compl. at *1.)

trailer bays and an interior office space. (Lease Agreement § 1.1(f).) The warehouse was built as a "spec facility," meaning that it was not designed for a specific tenant. (Murray Test., Hr'g Tr. at 83:24–84:2.) Prior to signing the Lease Agreement, Experior informed Defendants' representatives that it intended to use the Premises to store product packaged in cardboard boxes on the warehouse floor. (Oct. 11, 2023 Scialabba Decl. ¶ 24; Scialabba Test., Hr'g Tr. at 47:5–20, 49:6–7.) Experior was the first tenant after the warehouse was constructed. (*Id.* at 46:23–24.) The Lease Agreement commenced on February 1, 2023 and is scheduled to expire on May 31, 2028. (*Id.* § 1.1(i)–(j); Compl. ¶ 9, ECF No. 1.) Experior's estimated initial monthly rent under the Lease Agreement was $391,463.33. (Lease Agreement § 1.1(m).)

Section 3.1 of the Lease Agreement provides that "the premises are leased 'as is', with Tenant accepting all defects, if any." (*Id.* § 3.1(a) (capitalization altered).) The paragraph continues that BTC "makes no warranty of any kind, express or implied, with respect to the premises or common area" and disclaimed any warranty as to the "fitness or suitability of the premises for a particular purpose." (*Id.* (capitalization altered).) Experior "acknowledges that it has been given the opportunity to inspect the Premises and the Common Area and to have qualified experts inspect the Premises and Common Area prior to the execution of this Lease." (*Id.*) Before signing the Lease Agreement, Experior never asked to review structural plans for the warehouse or asked about whether there was a vapor barrier (explained below) used in the warehouse's construction. (Murray Test., Hr'g Tr. at 85:9–23.)

Article 18 of the Lease Agreement allows Experior to terminate the Lease Agreement in the event of a defined casualty. Section 18.3 reads:

> If (a) more than fifty percent (50%) of the Premises is rendered untenantable by damage or destruction caused by fire or any other casualty and, in the reasonable opinion of Landlord, such damage cannot be repaired within nine (9) months after the receipt of

3

> insurance proceeds . . . then Tenant may terminate this Lease by
> delivery of written notice to Landlord within thirty (30) days after
> the date on which such opinion is delivered to Tenant.

(Lease Agreement § 18.3.) Section 5.1 states "except as expressly set forth in this Lease, in no event shall Tenant be entitled to terminate this Lease, or to offset, deduct or abate Rent in the event that Tenant is unable to use the Premises for the permitted use." (*Id.* § 5.1; *see also id.* § 30.2 ("Tenant shall not for any reason withhold or reduce Tenant's required payments of Rent . . . .").)

Plaintiffs cite several sections of the Lease Agreement in connection with their Motion that address BTC's obligation to deliver and maintain the Premises. Section 3.1(b) states "Landlord hereby agrees to deliver the Premises with the heating, ventilating, and air-conditioning systems, . . . plumbing, sprinkler, mechanical and electrical systems serving the Premises . . . in good working order." (*Id.* § 3.1(b).) Regarding maintenance, the Lease Agreement provides that BTC "shall keep the structural elements of the foundation, exterior walls and roof of the Premises and subgrade plumbing and electrical systems to the point of connection to the Building in good repair . . . ." (*Id.* § 11.1(a).) Finally, Section 30.17 provides that Experior "shall . . . peaceably and quietly hold and enjoy the Premises for the entire Lease Term without hindrance or molestation from all persons claiming by, through or under Landlord." (*Id.* § 30.17.)

Prior to taking possession of the Premises, Experior, under the Lease Agreement's security deposit provision, was required to deliver to BTC a "specifically assignable Letter of Credit" for $1,500,000.000 issued to BTC. (*Id.* § 27.1.) The same section permitted BTC to draw down the Letter of Credit "[u]pon the occurrence of any default by Tenant . . . to satisfy any arrears of Rent . . . ." (*Id.*)[4] Section 23.1 defines Experior's default as occurring if Experior fails to pay rent within

---

[4] Two other sections of the Lease Agreement contained similar provisions permitting BTC to draw down the Letter of Credit if Experior. Section 23.8, entitled "Use of Security Deposit," states that: "Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use such funds to the extent necessary to make good any

five days of receiving written notice that it is due. (*Id.* § 23.1(a).) The Huntington National Bank issued the required $1.5 million Letter of Credit to BTC for Experior's account on February 17, 2023. (*See* Ex. A. to Oct. 11, 2023 Scialabba Decl.) The Letter of Credit was "secured by equipment which is owned by Experior and used in its business operations." (Compl. ¶ 26.) BTC required the $1.5 million Letter of Credit in lieu of a security deposit because of "red flags in Experior's credit report," and "BTC would not have leased [the Premises] to Experior without the letter of credit." (Oct. 30, 2023 Huber Decl. ¶ 27.)

### B.   WATER ISSUES AT THE PREMISES

On Friday, July 14, 2023, Experior discovered and first informed BTC of "water seepage and significant cracking in the concrete floor." (Oct. 11, 2023 Scialabba Aff. ¶ 19; Oct. 30, 2023 Huber Decl. ¶ 6.) Experior informed BTC that the water could result in "operational disruptions and significant financial implications." (Oct. 11, 2023 Scialabba Aff. ¶ 19.) Defendants inspected the Premises on July 18—the following Tuesday—and recommended that Experior continually operate the building's ventilation systems in order to clear the moisture and humidity from the air. (*Id.* ¶ 20; Oct. 30, 2023 Huber Decl. ¶¶ 8–9.) On July 24, BTC wrote to Experior, reiterating that it was important to run the building's ventilation systems. (Scialabba Test., Hr'g Tr. at 69:2–8.) Huber visited the Premises on July 25 and again advised Experior's representatives "that the issue was likely caused by the lack of ventilation and the extreme hot and humid weather" and that "[a]ny moisture on the concrete slab was limited to the concrete seams." (Oct. 30, 2023 Huber Decl. ¶ 10; *see also* Murray Test., Hr'g Tr. at 88:1–12 (moisture resulted from Experior not keeping the bay doors open or using the building's ventilation system).) On a visit by Defendants'

---

arrears of Rent." (Lease Agreement § 23.8.) Section 32.1 provides that BTC "may apply Tenant's Security Deposit to the extent necessary to make good any rent arrearage . . . ." (*Id.* § 32.1(f).)

employees to the Premises on July 30, Experior was not running the ventilation system. (Oct. 30, 2023 Huber Decl. ¶ 11.)[5]

Plaintiffs submitted photos taken at the Premises on July 14, July 25, July 27, and August 7, 2023, (Nov. 6, 2023 Scialabba Decl. ¶¶ 3–6), as well as timelapse videos of the facility taken over four days in August and September 2023, (*id.* ¶¶ 7–10). Upon review, the photos and videos show consistent darkening along each seam of the concrete floor. (Exs. 1–8 to Nov. 6, 2023 Scialabba Decl.) The photos also show several small cracks and several small puddles in isolated sections of the warehouse floor. (Exs. 1–4 to Nov. 6, 2023 Scialabba Decl.) Defendants also submitted photos taken on July 14, August 4, and August 24, 2023, which likewise showed darkening along the seams of the concrete but no puddles. (*See* Exs. B, E, & G to Oct. 30, 2023 Huber Decl.)

Scialabba also took photos of the floor of the warehouse on January 8 and 10, 2024. (Jan. 26, 2024 Scialabba Aff. ¶¶ 2–4.) The photos show the same consistent darkening around the concrete seams from the prior summer. (Ex. A to Jan. 26, 2024 Scialabba Aff.) The photos also show two small puddles from the January 8 visit, as well as a handful more from the January 10 visit. (*Id.*; Ex. B to Jan. 26, 2024 Scialabba Aff.) The isolated puddles from the January 2024 visits were caused by leaks in the warehouse roof. (Murray Test., Hr'g Tr. at 91:11–22.) Photos taken by the roofers who repaired the leaks showed a number of "[s]mall punctures," which were typical for such a large warehouse. (*Id.* at 95:17–96:1.)

Experior moved its "clothing and high-valuable product that was susceptible to moisture damage" from the Premises "immediately" after notifying Defendants of the water issues on July

---

[5] Plaintiffs also notified Defendants of other water issues—both stemming from the roof at the Premises—including a "sizable puddle of water on the concrete floor" noticed on February 27, 2023, (Oct. 11, 2023 Scialabba Aff. ¶ 17), and "water seepage in the office" in "wet ceiling tiles and insulation" noted on July 10, 2023, (*id.* ¶ 18). Defendants addressed both water leaks from the roof without issue. (Oct. 30, 2023 Huber Decl. ¶¶ 2–3.)

14, 2023. (Scialabba Test., Hr'g. Tr. at 51:9–11; *see also id.* at 50:16–25.) Experior did not immediately move their products that were on shelving units or that were already on pallets, and thus safe from water damage on the floor. (*Id.* at 51:6–9.) Experior removed "118 truckloads" of product from the warehouse between July 17 and July 21, 2023 and an additional "38 truckloads" on July 24, 2023. (Oct. 11, 2023 Scialabba Decl. ¶ 22.) Experior was forced to "palletize all the freight" and "divert truckloads of inbound product" to other storage facilities. (*Id.*) If Experior had not vacated the Premises, it "would be forced to provide pallets for every load" at its own expense. (*Id.* ¶ 23.)

On July 24, 2023, Experior's attorney wrote BTC a letter informing them that Experior was ceasing its operations at the warehouse. (Scialabba Test., Hr'g Tr. at 68:23–69:1.) After Experior filed the instant suit in August 2023, the parties entered a "Possession Agreement" under which Experior agreed to formally relinquish and vacate the Premises by September 29, 2023. (Ex. J to Oct. 30, 2023 Huber Decl., ECF No. 20-2 at *49–52.) The Possession Agreement did not terminate the Lease Agreement and preserved the parties' obligations under it—including Experior's obligation to pay rent.[6] (*Id.*; Oct. 30, 2023 Huber Decl. ¶ 26.) Experior completely vacated the Premises by September 29, 2023. (Oct. 11, 2023 Scialabba Decl. ¶ 22.)

The Lease Agreement began in January 2023, but Scialabba estimated that by the time the water issues arose six months later in July, Experior was only using 25 percent of the warehouse space. (Scialabba Test., Hr'g Tr. at 65:22–25.) Defendants' employees "routinely" visited the Premises after the Lease Agreement commenced and observed that "Experior's operation was limited to a nominal number of employees using a temporary card table as a base of operations."

---

[6] The Possession Agreement modified certain aspects of the Lease Agreement that are not germane to this Opinion.

(Oct. 30, 2023 Huber Decl. ¶ 2.) On July 18, 2023, Defendants' employees noticed that "other than a few pallets the warehouse was mostly empty." (*Id.* ¶ 7.) On July 25, 2023, Huber observed "at most one or two bays of product." (*Id.* ¶ 10.) Photos Plaintiffs took on July 14, 2023 show large portions of the inside of the warehouse but do not reveal any product stored anywhere in the warehouse. (Ex. 1 to Nov. 6, 2023 Scialabba Decl.)

## C.   CAUSE OF THE DARKENING ALONG THE CONCRETE SEAMS

The parties offer competing explanations for the cause of the darkening along the floor's concrete seams: Plaintiffs contend that faulty construction of the concrete slab permitted water to rise through the concrete and puddle on the floor, while Defendants argue that what limited moisture collected on the slab resulted from condensation from the humid air because Experior failed to properly ventilate the Premises. Experior's "concrete floor and moisture consultant" Craig performed "two sub-slab explorations" and two "soil moisture tests" that showed that "the moisture level in, and below the slab, is essentially 100%." (Oct. 24, 2023 Craig Aff. ¶¶ 3, 5.) Testing by a third party "confirmed . . . that the samples contained a hydrophilic substance in and along the joint line in the concrete," which would be "capable of drawing and holding moisture where moisture is present." (*Id.* ¶¶ 6–7.) Craig opined that liquid water could "bleed[] upward from joints during rainfall events." (*Id.* ¶ 8.)

Craig opined that Defendants could have installed a "vapor barrier" (also referred to as a "vapor retarder")—"a material or substance that retards the transfer of moisture from one location to another," (Craig. Test., Hr'g Tr. at 16:10–11)—underneath the slab in order to prevent the moisture's movement, (*id.* at 24:4–6). Craig stated that the American Concrete Institute ("ACI")—of which Craig is a member, (Oct. 24, 2023 Craig Decl. ¶ 4)—"recommends that an effective vapor retarder be installed directly below concrete slabs-on-ground." (*Id.* ¶ 11.) Craig has taken part in

research and advocacy efforts over the past twenty years for the ACI to make this recommendation. (Nov. 3, 2023 Craig Decl. ¶¶ 10–11.) Craig also testified that a vapor barrier under the concrete was a standard "mandate[d]" by ASTM F710, a publication by the American Society of Testing and Materials. (Craig Test., Hr'g Tr. at 15:1–13 ("[I]t's not optional anymore."); *id.* at 15:16–18, 16:1–8.) Asked whether use of a vapor barrier was standard in the industry, however, Craig testified: "I would not say it is standard in the big box development market. It has become far more frequent in the big box development than it was 10 years ago." (*Id.* at 17:25–18:2.) Craig continued that use of a vapor barrier "depends who the client is" or "who the developer is, whether it's standard practice for them; it may not be standard practice for someone else." (*Id.* at 18:4–7.)

Craig concluded that "due to the absence of an effective vapor retarder directly below the slab, moisture sensitive materials cannot be stored safely on the floor slab," thus deeming the warehouse "unfit for Experior's intended use." (Oct. 24, 2023 Craig Aff. ¶¶ 8–9, 11.) However, Craig also acknowledged that the Premises could be used for other commercial purposes, just not for Experior's "specific use." (Craig Test., Hr'g Tr. at 27:7–9.)

On the other hand, Defendants presented testimony about the warehouse's construction from Harrison and Murray: Harrison is a structural engineer who was hired to design the warehouse, including the floor slab and the foundations, (Harrison Test., Hr'g Tr. at 110:18–21, 111:11–20), while Murray was the Ares employee who oversaw construction of the warehouse, (Murray Test., Hr'g Tr. at 82:21–25, 83:19–23). Harrison agreed that there was "evidence of some type of staining on both sides of each joint" but that the floor slabs were "in good condition" with only "one random crack." (Aug. 14, 2023 Harrison Memo at 1.) On September 8, 2023, Harrison took two core samples from the warehouse floor at the slab joints. (Sept. 11, 2023 Harrison Memo at 1.) Harrison determined that the darkening was a "surface stain" that was "paper thin" at the top

of the slab. (*Id.*) Harrison opined that it was not possible for hydrostatic pressure to force water upwards through the joints given the grade on which the warehouse was built, the consistency of the stains along the joints, and the fact that cured concrete is rarely stained by water. (Aug. 14, 2023 Harrison Memo at 2.) Harrison opined that any moisture seen results not from moisture moving from the soil through the concrete slab but rather from condensation from the humid air. (*Id.*)

Harrison believed that the stain along the joint resulted from "mastic material applied at the slab" during construction which was not scraped clean and that "is attracting moisture in the building" due to "the warehouse being an unconditioned space." (*Id.* at 1–2.) Murray agreed that there will be staining along the joints in perpetuity, but this is not indicative of constant moisture developing. (Murray Test., Hr'g Tr. at 93:3–25.) Murray explained that when the slab is poured, the joints are cut and then filled with caulk; when the joints are caulked, the caulk material "overflow[s] the joint" and the excess is scraped off. (*Id.*) Murray testified that the dark stain along each of the joints resulted from this "fairly wide" application of caulk at the joints, accentuated by the high humidity and moisture collecting on the slab. (*Id.* at 93:18–21.)

Harrison's firm has designed "over 200 warehouse type facilities" without a vapor barrier and without issue, and "[m]ost unconditioned HVAC buildings do not have a vapor retarder/barrier in this region." (Oct. 24, 2023 Harrison Memo at 1.) Of the warehouses that Harrison's firm designed, Harrison estimated that the firm included vapor barriers in 5 to 10 percent. (Harrison Test., Hr'g Tr. at 112:2–10, 114:13–17.) Murray has built over 40 industrial building projects in New Jersey, of which approximately 75 percent were built without vapor barriers. (Murray Test., Hr'g Tr. at 82:17–20, 84:17–19.) Warehouse developers generally do not include vapor barriers without a specific need because omitting a vapor barrier resulted in "a better, more serviceable

slab." (*Id.* at 84:12–16, 85:4–8; *see also* Harrison Test., Hr'g Tr. at 112:21–114:12 (vapor barriers can be "detrimental to the floor slab construction" by preventing even drying of the concrete).)[7]

### D.   HARM TO PLAINTIFFS' BUSINESS

Scialabba states that between July 2023 (when water seepage was discovered at the Premises) and October 2023 (when Plaintiffs filed their Motion), Experior's New Jersey operations "have been forced to shrink" from 20 to 12 employees. (Oct. 11, 2023 Scialabba Aff. ¶ 9.) If BTC draws down the Letter of Credit, Experior "expects that its remaining 12 New Jersey employees will lose their jobs due to an absence of capital funding of Experior's operations in New Jersey." (*Id.* ¶ 9.) Scialabba states that Experior has expended "substantial sums of money" as a result of vacating the warehouse and redirecting shipments to other facilities, has lost revenue, and will therefore be "unable to pay rent or other charges" under the Lease Agreement. (*Id.* ¶¶ 27–30.)

Scialabba also contends more vaguely that drawing down the Letter of Credit will affect Experior's operations outside of New Jersey. The Letter of Credit draw down will "interfere with the employment of 18 other Experior employees located in Illinois and Texas," who "may" all ultimately lose their jobs because "available capital will be frozen and Experior's assets will be threatened." (*Id.* ¶ 10.) Experior's tractor trailers, which are "owned by [its] sister company,

---

[7] After the parties' original settlement discussions failed in January 2024 and the Court re-set a date for a hearing, Plaintiffs submitted declarations from two additional experts they intended to call at the hearing: Scott Tarr, a civil engineer, and Martin Upchurch, an industrial hygienist. (ECF Nos. 37-3, 37-4.) Defendants objected to any testimony from these two witnesses on the grounds that Plaintiffs did not identify them ahead of the original hearing on the Motion for Preliminary Injunction. (ECF No. 38.)

The Court does not consider these additional expert's declarations. Plaintiffs' did not call either witness to testify at the Hearing, and neither witness has any prior familiarity with the Premises or visited it. Each witness's submission consists solely of a two- or three-page declaration based on reviewing photos of the Premises and Craig's materials. The witnesses' opinions are not sufficiently developed for the Court to rely on them at this juncture. Further, the Court agrees with Defendants that there is an element of unfairness to permitting Plaintiffs to submit expert witness declarations collected in the period of time while Defendants had agreed to attempt to settle the parties' dispute, during which time Defendants consented for the TRO to remain in place.

Experior Transport," are the assets "supporting" the Letter of Credit. (*Id.* ¶ 11.) Scialabba stated that the expected "interference" with the tractor trailers "will have a secondary negative impact on the ongoing business operations of Experior Transport . . . ." (*Id.*) Ultimately, Scialabba contends that a drawdown makes it "reasonably likely" that operations at its warehouses will "cease or be forced to slow down considerably" and "threatens to halt, or at least suspend, the ongoing operations of Experior as a company." (*Id.* ¶ 13.) While testifying briefly about the harm to Plaintiffs at the Motion hearing, Scialabba acknowledged that he understood BTC may draw down on the Letter of Credit at the time he signed the Lease Agreement. (Scialabba Test., Hr'g Tr. at 58:9–20.)

### E.   PROCEDURAL HISTORY

Plaintiffs filed their Complaint on August 23, 2023, alleging claims for breach of contract, constructive eviction, fraud, and negligent misrepresentation. (ECF No. 1.) Plaintiffs concurrently filed a motion for a temporary restraining order seeking to enjoin Defendants from drawing down on the Letter of Credit. (ECF No. 3.) The Court denied the motion, ruling in part that "[a]ny amount that Defendants may draw from the [Letter of Credit] is readily quantifiable" and that because "Defendants have not drawn from the [Letter of Credit] [or] insinuated that they intend to do so," the harm is "entirely speculative." (ECF No. 6 at 6.)

On October 11, 2023, Plaintiffs filed a renewed motion for a temporary restraining order, styled as a motion for preliminary injunction. (ECF No. 13.) Defendants had notified Plaintiffs that they planned to imminently draw down the Letter of Credit in the amount of $829,749.21, and the Huntington National Bank indicated that it would permit Defendants to do so absent a Court order. (ECF No. 13-3 at 2.) The Court held an emergency telephonic hearing on October 13, 2023

at which it heard argument from the parties, granted the TRO, and set a briefing schedule and date for a full hearing on Plaintiffs' requested preliminary injunction. (ECF Nos. 16, 17.)

At the date scheduled for the hearing, the parties consented to postpone the hearing pending settlement negotiations, during which time the Court abstained from deciding the Motion for Preliminary Injunction and the TRO remained in effect. (*See* ECF No. 26.) Plaintiffs filed a letter on January 29, 2024 indicating that settlement discussions had failed, (ECF No. 34), and the Court set a new preliminary injunction hearing date, (ECF No. 36). On March 18, 2024, the Court held a hearing on Plaintiffs' pending Motion, at which it heard testimony from two witnesses for each side. (ECF Nos. 48, 50.) At the conclusion of the hearing, the parties consented to mediate their dispute, as a result of which the Court administratively terminated the Motion. (ECF No. 52.)

On June 5, 2024, the parties filed a joint letter indicating that mediation before Judge Arpert on May 29, 2024 was unsuccessful. (ECF No. 65.) Defendants also requested re-activation of the Motion for Preliminary Injunction, (ECF No. 66), and Plaintiffs agreed that a decision was now needed, (ECF No. 67). In addition to the evidence cited above, the Court decides the pending Motion with the benefit of the parties' briefing filed in the fall: Plaintiffs' October 11, 2023 moving brief in support of their Motion, ("Pls.' Br.", ECF No. 13-3), Defendants' October 30, 2023 opposition brief, ("Defs.' Opp. Br.", ECF No. 20), and Plaintiffs' November 6, 2023 reply brief, ("Pls.' Reply Br.", ECF No. 22).[8]

---

[8] Plaintiffs request the opportunity to "provide proposed findings of fact and conclusions of law pursuant to Fed R. Civ Pro 65(d)" prior to the Court issuing a decision. (ECF No. 67.) However, Rule 65(d) merely addresses the required contents of an injunctive order, Fed. R. Civ. P. 65(d), and Plaintiffs cite no authority requiring the Court to permit the parties to provide proposed findings of fact and conclusions of law. Given the parties' voluminous submissions over the past nine months and their ample opportunities to articulate their positions during the multiple conferences and one hearing before the Court, the Court sees no need to permit further submissions and that the interests of justice would not be served by further delaying a decision on the Motion.

## II.     **LEGAL STANDARD**

Granting a preliminary injunction is an "extraordinary remedy" that "should be granted only in limited circumstances." *Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018) (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). In determining whether to grant a motion for preliminary injunctive relief, the Court considers four factors: (1) whether the movant has shown "a reasonable probability of eventual success in the litigation"; (2) whether the movant "will be irreparably injured . . . if relief is not granted"; (3) "the possibility of harm to other interested persons from the grant or denial of the injunction"; and (4) whether granting the preliminary relief will be in "the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). Once the movant establishes the first two threshold factors, the Court "in its sound discretion" balances all four factors to determine whether preliminary injunctive relief is appropriate. *Id.* The movant bears the burden of showing its entitlement to an injunction. *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)). "[F]ailure to establish any element . . . renders a preliminary injunction inappropriate." *Id.* (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).

## III.     **DISCUSSION**

Before proceeding to the elements, the Court observes that its decision denying Plaintiffs' Motion for Preliminary Injunction today follows its prior decision to grant a TRO. (ECF No. 16.) However, the Court is not bound by the factual findings or legal conclusions underpinning its prior decision. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395–96 (1981) ("Because of the limited nature of the proceedings resulting in the preliminary injunction, any findings of fact and

conclusions of law made at the preliminary stage are of no binding effect whatsoever."). Plaintiffs filed their TRO request at approximately 5 p.m. on Wednesday, October 11, 2023, indicating that Defendants would draw down on the Letter of Credit by 12 p.m. noon the following Friday absent a court order. (ECF No. 13.) The Court conferenced the parties twice, heard argument, and issued its TRO decision within 48 hours based on the limited record before it. The Court's decision reaching the opposite outcome now benefits from a more fulsome record after the parties' have had extensive opportunities to present evidence and argue the relevant issues.

Applying the four factors here, the Court finds that Plaintiffs have not met their burden to establish the first two elements, let alone that on balance all four factors require entry of a preliminary injunction.

## A.   LIKELIHOOD OF SUCCESS ON THE MERITS

To meet the first prong, a movant "need[] only to show a likelihood of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). The movant's showing must be "significantly better than negligible but not necessarily more likely than not" that it will ultimately prevail. *Reilly*, 858 F.3d at 179. A plaintiff is "not required to prove [its] case in full at a preliminary-injunction hearing . . . ." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). The Court must evaluate the probable success of a plaintiff's claim in light of the evidence of irreparable harm, as "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (citing *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

In arguing their likelihood to succeed on the merits, Plaintiffs point to three provisions of the Lease Agreement that they contend Defendants breached and caused Experior's constructive eviction. (Pls.' Br. at 10.) First, Plaintiffs argue that Defendants have violated Section 3.1(b)—which requires BTC to maintain the building systems in "good working order"—and Section 11(a)—which requires BTC to keep the "structural elements of the foundation, exterior walls and roof" in "good repair." (*Id.*) Plaintiffs contend that BTC breached these provisions by failing to remedy the water seepage Plaintiffs' expert identified at the Premises. (*Id.*) Second, Plaintiffs contend that BTC has breached the Lease Agreement provision requiring them to provide "quiet enjoyment" of the Premises, resulting in Experior's constructive eviction. (*Id.* at 11–12; *see also* Pls.' Reply Br. at 5–6.)

Defendants respond that they met their obligations under the Lease Agreement and there is no basis to find constructive eviction. When first notified about the water seepage, they repeatedly inspected the warehouse and met with Experior and took steps to remedy the water by advising Experior to operate the HVAC system continually and installing extra fans at the warehouse. (Defs.' Br. at 6.) The water accumulation occurred only in July and was limited to areas around the slab joints. (*Id.* at 6–7.) Any water around the joints resulted from Experior failing to use the ventilation system during the summer months. (*Id.* at 7.) Experior also agreed in the Lease Agreement to accept the building "as is" and could have declined to lease the warehouse if they preferred one with a vapor barrier. (*Id.* at 8.) Defendants also point to the Lease Agreement provisions that provide a procedure for Experior to vacate the premises if it because untenantable and argue that Experior did not comply with those provisions here. (*Id.* at 9.)

The Court first addresses Plaintiffs' constructive eviction argument. Section 30.17 of the Lease Agreement provides that Experior "shall . . . peaceably and quietly hold and enjoy the

Premises for the entire Lease Term without hindrance or molestation from all persons claiming by, through or under Landlord." (Lease Agreement § 30.17.) The New Jersey Supreme Court instructs that a constructive eviction occurs when a landlord's "act or omission . . . renders the premises substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises." *Reste Realty Corp. v. Cooper*, 251 A.2d 268, 274 (N.J. 1969).

Plaintiffs have not established that they are reasonably likely to succeed on their constructive eviction argument based on what appears to be, at most, limited water intrusion at the Premises. At the outset, the Court notes that for the purposes of this Motion, Plaintiffs' arguments related to cracks in the concrete, water leaking in the office portion of the Premises, or a pool of water in February 2023 do not establish constructive eviction. (*See* Pls.' Br. at 3, 5, 10 (cracks); *id.* at 3–4 (water in the office); *id.* at 3 (water in February 2023); *see also* Pls.' Reply Br. at 1–2.) The only evidence of cracking are one or two small cracks shown in several photos, (Exs. 1–4 to Nov. 6, 2023 Scialabba Decl.), and the concrete was otherwise "in good condition," (Aug. 14, 2023 Harrison Memo at 1). Plaintiffs offered no evidence that the water leak in the office area disrupted their operations, and the office area leak, as well as the February 2023 leak in the warehouse space, were addressed by Defendants. (Oct. 30, 2023 Huber Decl. ¶¶ 2–3.) Because Plaintiffs have not argued that these isolated incidents had any effect on their product or their ability to use the main warehouse space, this evidence appears irrelevant to the constructive eviction argument.

Plaintiffs' evidence of a handful of puddles of water at scattered points throughout the expansive 266,000-square foot warehouse likewise does not establish constructive eviction. The Court has carefully reviewed the multitude of submitted photos and videos of the Premises taken

over the past year. (*See* Exs. 1–8 to Nov. 6, 2023 Scialabba Decl.; Exs. B, E, & G to Oct. 30, 2023 Huber Decl.) While the images and recordings consistently show darkening around the concrete slab joints (addressed below), there is no evidence of widespread flooding throughout the Premises that would prevent Experior from making use of the overwhelming square footage of the space. Instead, the evidence shows largely dry floorspace with only sporadic examples of small puddles, as might be expected in photos taken over several months in a 266,000-square foot warehouse space. Although there is insufficient evidence that these isolated puddles resulted from moisture beneath the Premises, even assuming *arguendo* that they did, there is no indication that the puddles "render[ed] the premises substantially unsuitable" for warehousing or "seriously interfere[d] with the beneficial enjoyment of the premises" by Experior. *Reste Realty Corp.*, 251 A.2d at 274. Plaintiffs fail to establish that relatively minor and sporadic puddles in the entire warehouse space inhibited their operations.

However, even considering Plaintiffs' primary argument—regarding BTC's failure to include a vapor barrier beneath the warehouse's concrete slab—the Court finds that Plaintiffs have not established a reasonable probability that they could show constructive eviction. The darkening along all concrete joints at the Premises is evident and irrefutable, and Defendants acknowledge that the stain is permanent. (Murray Test., Hr'g Tr. at 93:3–25.) However, Plaintiffs did not establish that this darkening reflected moisture that could transfer to product stored on the concrete. Harrison and Murray persuasively opined that the darkening along the joints resulted from a mastic material applied when the joints were cut and filled that absorbed moisture from the air. (Sept. 11, 2023 Harrison Memo at 1; Aug. 14, 2023 Harrison Memo at 1–2; Murray Test., Hr'g Tr. at 93:3–25.) While Craig opined that liquid water could "bleed[] upward from joints during rainfall events," (Oct. 24, 2023 Craig Aff. ¶ 8), he did not credibly or thoroughly explain how this process

works or offer strong evidence that sub-slab moisture would have damaged Plaintiffs' product at the warehouse had any been present. In any event, the parties' disagreement over, among other points, whether the stained concrete joints evidenced water that would continually threaten any product stored in the Premises cautions against granting a preliminary injunction. *See Aleynikov v. Goldman Sachs Grp., Inc.*, No. 12-5994, 2012 WL 6603397, at *7 (D.N.J. Dec. 14, 2012) (finding that plaintiff had not established a likelihood of success on the merits where "the Court's doubts as to [a disputed question] remain substantial"); *Gruntal & Co. v. Steinberg*, 843 F. Supp. 1, 16 (D.N.J. 1994) (vacating a previously entered preliminary injunction where newly introduced facts placed the court's conclusion regarding the arbitrability of a matter "into doubt"); *cf. Apollo Techs. Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157, 1191 (D.N.J. 1992) ("[A] preliminary injunction cannot be issued when there are disputed issues of fact.").

The Court's conclusion on this point is bolstered by several other lines of reasoning. First, there is no evidence of *actual* interference with Experior's use and enjoyment of the Premises because Experior only ever used a small fraction of the warehouse space and immediately vacated the Premises after complaining about water to Defendants in July 2023. Huber stated, and review of Plaintiffs' photos taken on July 14, 2023 confirm, that Experior never made significant use of the Premises despite the fact that its lease began approximately one-half year earlier. (Oct. 30, 2023 Huber Decl. ¶ 2; Ex. 1 to Nov. 6, 2023 Scialabba Decl.) Plaintiffs identified the water issue to Defendants on a Friday in July and Defendants inspected the premises on the following Tuesday. (Oct. 11, 2023 Scialabba Aff. ¶¶ 19–20; Oct. 30, 2023 Huber Decl. ¶¶ 6–9.) In that several-day period, Experior moved the vast majority of the product it had at the Premises off-site. (Oct. 11, 2023 Scialabba Decl. ¶ 22.) By the end of that month, Plaintiffs had made the decision to cease operations at the Premises. (Scialabba Test., Hr'g Tr. at 68:23–69:1.)

While the Court does not address Defendants' arguments that this evidence demonstrates Experior's attempt to manufacture an "excuse to break its Lease with BTC," (Defs.' Br. at 1), the Court finds that it does undermine Plaintiffs' constructive eviction arguments. In *Reste Realty Corp.*, the case on which Plaintiffs primarily rely, (Pls.' Br. at 11), the basement office space a tenant had rented regularly flooded with up to five inches of water as a result of what the landlord acknowledged was improper grading on the driveway abutting the building, *Reste Realty Corp.*, 251 A.2d at 270. Over several years' time, the tenant had attempted to remove the water during the floods or work around the flooding, but there were nonetheless severe disruptions to the tenant's business when operating with the water present. *Id.* In contrast here, the evidence of actual disruption of Experior's business operations, like the evidence of actual water damage, is much less clear. Plaintiffs offer no testimony of any product ever becoming damp from sub-slab moisture or of any water-damaged products costing Plaintiffs money. Nor do Plaintiffs offer any evidence that they attempted to work around the alleged slab defect by, for example, storing product in the center of the slabs or palletizing some or all of their products.[9] Instead, the lack of product at the Premises compels Plaintiffs to speculate that *had there* been customers' product at the warehouse, it would have been damaged by moisture resulting from the absent vapor barrier.

---

[9] Indeed, Scialabba's statements that after July 14, 2023 Experior did not immediately move product at the Premises that were on pallets, (Scialabba Test., Hr'g. Tr. at 51:6–9), and that failing to leave the Premises would have required Experior to palletize every shipment, (Oct. 11, 2023 Scialabba Decl. ¶ 23), suggests that storing products on pallets to keep them away from moisture on the slab was a viable, albeit more expensive, way for Experior to attempt to use the Premises after July 14. At the Hearing, Scialabba testified that palletizing the product was not feasible because putting product on pallets would prevent stacking, which would lose "efficiency" and was not Experior's "business model." (Scialabba Test., Hr'g. Tr. at 47:25–49:5.) Asked about the feasibility of palletizing the product, Craig generally testified that a pallet could have "dirt" or "any form of organic matter" that, if the pallet "sits there long enough" could react to moisture from the slab to cause mold. (Craig Test., Hr'g Tr. at 27:22–28:9.)

The Court found these arguments unconvincing as they primarily centered on the increased cost of palletization rather than its impossibility. In any event, the witnesses' testimony regarding the feasibility of palletization is speculative because, as noted above, Experior only used a small portion of the space and vacated shortly after July 14, 2023, rather than attempting to find a solution to remain in the space.

Such clear-cut evidence of water damage and actual disruption to the tenant's operations is present in all the constructive eviction cases Plaintiffs offer. (Pls.' Reply Br. at 5–6); *see, e.g.*, *Genesco Inc. v. Monumental Life Ins. Co.*, 577 F. Supp. 72, 80 (D.S.C. 1983) (leasehold for retail tenant suffered a "lengthy split or rupture in the roof" that included "blistered and/or ruptured" roofing membranes that "allowed water to penetrate the roof and . . . leak[] in numerous places inside"), *aff'd sub nom. Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253 (4th Cir. 1984); *Coastal Logistics, Inc. v. Centerpoint Garden City, LLC*, No. 12-294, 2013 WL 12140985, at *1 (S.D. Ga. Dec. 3, 2013) (leased warehouse "began to crack and deteriorate"); *In re Lathrop*, 257 B.R. 669, 671 (Bankr. E.D. Va. 2000) (leasehold for restaurant tenant experienced "serious" leaking from rainwater over six months including water "c[oming] through ceilings and [] r[unning] out of electrical outlets," requiring tenant to "place buckets to catch water and to close off parts of the restaurant which could not be used due to the falling water").

Second, the fact that *some* warehouses are built with vapor barriers—and that Experior informed BTC that it planned to store cardboard boxes directly on the concrete—does not carry Plaintiffs' burden. The Court credits Defendants' witnesses' persuasive testimony that the majority of comparable warehouse spaces built in this region are built without a vapor barrier, (Harrison Test., Hr'g Tr. at 112:2–10, 114:13–17; Murray Test., Hr'g Tr. at 82:17–20, 84:17–19), as omitting a vapor barrier generally results in "a better, more serviceable [concrete] slab." (*Id.* at 84:12–16, 85:4–8; *see also* Harrison Test., Hr'g Tr. at 112:21–114:12.) Indeed, Craig never opined that the Premises here were defective, just that they were not appropriate "for [Experior's] specific use." (Craig Test., Hr'g Tr. at 27:7–9.) While Craig opined that the ACI, with Craig's involvement, recommends use of a vapor barrier below concrete slabs, (Oct. 24, 2023 Craig Decl. ¶ 11), in testimony Craig later appeared to significantly walk back this definitive assertion, agreeing that

use of a vapor barrier is "not . . . standard in the big box development market," just "far more frequent." (Craig Test., Hr'g Tr. at 17:25–18:2; *see also id.* at 18:4–7 (noting that use of a vapor barrier depends "who the developer is").) The Premises here was not built for a specific tenant. (Murray Test., Hr'g Tr. at 83:24–84:2.) Even assuming Plaintiffs' specific intended uses for the Premises would be best served by a vapor barrier below their warehouse slab, it was routine, even logical, for Defendants to construct the Premises without one here.

The parties are sophisticated business entities that entered into a Lease Agreement governing their relationship. Even assuming that Experior informed Defendants' representatives that Experior intended to use the Premises to store product packaged in cardboard boxes directly on the warehouse floor, (Scialabba Test., Hr'g Tr. at 47:5–20), the Court would not find that BTC was obligated to ensure that the warehouse's construction precisely accorded with how Experior intended to use the Premises. Section 3.1 of the Lease Agreement provides, in all capital letters, that BTC "makes no warranty of any kind, express or implied, with respect to the premises or common area" and disclaims any warranty as to the "fitness or suitability of the premises for a particular purpose." (Lease Agreement § 3.1(a) (capitalization altered).) Experior "acknowledge[d] that it has been given the opportunity to inspect the Premises and the Common Area and to have qualified experts inspect the Premises and Common Area prior to the execution of this Lease." (*Id.*) Craig testified that Experior could have determined whether a vapor barrier existed by asking Defendants, inspecting the construction plans, or taking a core sample. (Craig Test., Hr'g Tr. at 33:22–34:11.) Experior declined to exercise its contractual right to inspect the Premises or inquire whether a vapor barrier was employed when the Premises was constructed. (Murray Test., Hr'g Tr. at 85:9–23.) Indeed, nothing stopped Experior from inquiring at any point during the contract negotiations whether there was a vapor barrier. The parties' evidence

articulated above established that while vapor barriers are certainly present in some warehouse spaces in New Jersey, the majority of warehouses recently built in New Jersey were built *without* a vapor barrier. Therefore, there was no basis for Experior to assume prior to signing the Lease Agreement that a vapor barrier was used in the Premises's construction, especially given the Lease Agreement's specific assignment of the responsibility on Experior to determine whether the warehouse suited its intended use.

The Court only briefly addresses Plaintiffs' other merits arguments, which fail for similar reasons. Section 3.1(b) of the Lease Agreement required BTC to deliver the Premises "with the heating, ventilating, and air-conditioning systems, . . . plumbing, sprinkler, mechanical and electrical systems serving the Premises . . . in good working order." (Lease Agreement § 3.1(b).) Reading the "plain meaning" of the contract's language, *Colony Ins. Co. v. Aspen Specialty Ins. Co.*, 564 F. Supp. 3d 343, 353 (D.N.J. 2021) (citation omitted), the Court does not see how the concrete slab falls within this list of building systems listed in Section 3.1(b). Setting that aside, Plaintiffs have offered no evidence that the slab was not "in good working order." Harrison opined that the floor slab was in "good condition" when he inspected it in August 2023. (*See* Aug. 14, 2023 Harrison Memo at 1.) Indeed, in contrast to a leaking roof or a malfunctioning sprinkler, the concrete slab here was constructed and functioned exactly as intended. (Murray Test, Hr'g Tr. at 84:12–16, 85:4–8, Harrison Test., Hr'g Tr. at 112:21–114:12 (explaining why warehouses were constructed without a vapor barrier).)

Likewise, Plaintiffs have not established that they will likely succeed on their argument that Defendants violated Section 11(a). That maintenance provision required BTC to "keep the structural elements of the foundation, exterior walls and roof of the Premises and subgrade plumbing and electrical systems to the point of connection to the Building in good repair . . . ."

(Lease Agreement § 11.1(a).) The concrete slab unquestionably counts as part of the foundation. However, as explained above, the evidence presented supports a finding that the slab was "in good repair," even if the warehouse's design did not accord with Experior's intended use for the Premises or business model. Further, as summarized in Section I.B, *supra*, Defendants attentively responded to Experior's concerns about moisture, inspecting the Premises within days after Experior raised concerns, hiring Harrison to take core samples and examine the Premises, and providing solutions to reduce the moisture present in the Premises. Therefore, the Court finds that Plaintiffs have not shown that they will likely be able to show that BTC violated its obligations under the Lease Agreement, such that Experior's peremptory removal from the Premises was justified.

### B.   IRREPARABLE HARM

Turning to the second prong of the preliminary injunction analysis, Plaintiffs must establish that they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. Establishing irreparable harm requires the movant to demonstrate a "'clear showing of immediate irreparable injury,' or a 'presently existing actual threat,'" *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (citation omitted); and that the alleged harm is "of a peculiar nature, so that compensation in money cannot atone for it," *id.* at 653 (quoting *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976)). In the Third Circuit, "the requisite feared injury or harm must be irreparable not merely serious or substantial." *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977).

Plaintiffs argue that they have established irreparable harm because Experior "will be subject to loss of jobs, loss of the entirety of a business, and the loss of goodwill with its customers if a preliminary injunction is not put in place." (Pls.' Br. at 13.) Plaintiffs contend that permitting

the Letter of Credit to be drawn down will negatively affect Plaintiffs' employees, Plaintiffs' customers, and its sister company by "interfer[ing] with the use and operation" of the tractor trailers owned by the sister company. (*Id.* at 13–14.) Plaintiffs threaten that this will "cripple Plaintiffs and potentially end the case . . . ." (*Id.* at 14.) Defendants respond that it is well-established law that a movant cannot establish irreparable injury when money damages are ultimately available. (Defs.' Br. at 4.) Defendants also argue that Plaintiffs have not met their burden of proof to establish *how* the Letter of Credit drawdown—which Defendants point out is specifically allowed in this scenario in the Lease Agreement—will affect Plaintiffs' business. (*Id.* at 5.)

The Court begins with Plaintiffs' argument that money damages cannot make them whole if an injunction is not entered and Plaintiffs ultimately prevail. To establish irreparable harm, an injury must "be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno*, 40 F.3d at 653 (quoting *A.O. Smith Corp.*, 530 F.2d at 525). The "loss of potential business opportunities, profits, customers, or contracts is compensable by money damages and does not constitute irreparable injury." *Apollo Tech. Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157, 1209 (D.N.J. 1992) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989); *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1141 (3d Cir. 1982)). Courts have applied this principle to find no irreparable harm "even when an action will result in the destruction of a business" if the loss is "capable of ascertainment and award at final judgment." *Figueroa v. Precision Surgical, Inc.*, No. 10-4449, 2011 WL 1368778, at *5 (3d. Cir. Apr. 12, 2011); *see also Levine v. BlockFi Inc.*, No. 21-11934, 2021 WL 3508831, at *2 (D.N.J. Aug. 9, 2021) (discussing *Figueroa*).

A narrow band of cases have acknowledged that irreparable harm may be found if denying the motion would result in the destruction of a business and money damages would be inadequate. In *Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.*, the Third Circuit reversed the district court's grant of a preliminary injunction on the irreparable harm prong. No. 22-1710, 2022 WL 3536494, at *7 (3d Cir. Aug. 5, 2022). There, the plaintiff, a food distributor, had an agreement to distribute cakes for the defendant supplier, which the defendant attempted to terminate. The district court found irreparable harm based on the plaintiff's allegations that it would lose its investment in the promotion of defendants' products, good will from its sales of the cakes, and the sales of other products that it distributed along with defendants' cakes. *Id.* at *5. On appeal, the Third Circuit acknowledged that losses that would "force[] [the business] to shut down" could constitute irreparable harm. *Id.* at *6 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3d Cir. 1989)). This is a "significant" threshold that may not be met even when a company may lose 80% of its business from the termination of a business agreement, along with "many if not all of its employees." *Id.* However on the facts before it, the Third Circuit found that the movant had not made this extraordinary showing and reversed the trial court's injunction.

Finally, the Court notes that Defendants' action Plaintiffs seek to enjoin here—drawing down the Letter of Credit—is specifically contemplated in the parties' Lease Agreement. BTC would not have leased the Premises to Experior without the security provided by Letter of Credit, as BTC was concerned by "red flags in Experior's credit report." (Oct. 30, 2023 Huber Decl. ¶ 27.) Multiple provisions of the Lease Agreement permitted BTC to draw down the Letter of Credit if Experior defaulted on the lease by not paying rent. (Lease Agreement §§ 23.8, 27.1, 32.1(f).) At the Hearing, Scialabba testified that at the time he signed the Lease Agreement on Experior's behalf, he understood that BTC could draw down the Letter of Credit. (Scialabba Test., Hr'g Tr.

at 58:9–20.) Plaintiffs, sophisticated business entities, had the opportunity to negotiate the terms of the Lease Agreement, including all provisions regarding the Letter of Credit. The Court's decision merely allows the parties to abide by the terms of the agreed-upon contract. While the Court is sensitive to the possibility that vacating the order preventing Defendants from drawing down the Letter of Credit may have significant effects on Plaintiffs' business, the Lease Agreement that Plaintiffs entered into specifically authorizes Defendants to do so. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.").

Plaintiffs here have not met the high bar of establishing irreparable harm, even assuming that the referenced negative business consequences the drawdown may have on Plaintiffs do in fact occur. Scialabba wrote that he "expect[ed]" that a drawdown on the Letter of Credit would cause Experior's 12 New Jersey employees to lose their jobs, (Oct. 11, 2023 Scialabba Aff. ¶ 9), and "interfere" with Experior's employees and operations outside of New Jersey, (*id.* ¶ 10). At trial, Scialabba testified "we are going to have to lay off probably about 30 percent of the staff . . . " (Scialabba Test., Hr'g Tr. at 57:3–9.) While this would be a severe outcome if it came to pass, it does not meet the "significant" threshold the Third Circuit outlined in *Golden Fortune Imp. & Exp. Corp.*, 2022 WL 3536494, at *6–7 (3d Cir. Aug. 5, 2022). The two non-binding cases Plaintiffs cite are factually distinguishable. *Marine Elec. Sys., Inc. v. MES Fin., LLC*, 644 F. Supp. 3d 84, 95 (D.N.J. 2022) (loss of equity ownership in company and loss control rights as a CEO and employee over the company constituted irreparable injury); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204 (2d Cir. 1970) (temporarily enjoining automobile manufacturer from terminating the plaintiff's 20-year-old automobile dealership).

\* \* \*

Because Plaintiffs have not met their burden on either the first or second elements of the preliminary injunction analysis, the Court need not consider the remaining factors, and Plaintiffs' Motion must be denied. *See Reilly*, 858 F.3d at 179 (requiring the Court to balance all four factors once the first two "gateway factors are met").

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for a Preliminary Injunction is **DENIED**. (ECF No. 13.) The Court will **VACATE** the October 13, 2023 Temporary Restraining Order, (ECF No. 16), which will allow Defendants to draw down the Letter of Credit in accordance with the parties' Lease Agreement. An appropriate Order accompanies this Opinion.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: July 15, 2024

29